[No. 26160-0-II. Division Two. August 24, 2001.]

PETER TASSONI, *Appellant*, v. THE DEPARTMENT OF RETIREMENT SYSTEMS, *Respondent*.

*Wayne L. Williams* (of *Rolland, O'Malley, Williams & Wyckoff, P.S.*), for appellant.

*Christine O. Gregoire, Attorney General*, and *Jerome E. Westby, Assistant*, for respondent.

ARMSTRONG, C.J. — Peter Tassoni has worked for the State intermittently since 1973. A former statute required the Department of Retirement Systems (DRS) to notify the State agency employing a returning employee of the procedure to reinstate the employee's retirement benefits. When Tassoni last returned to State employment in 1991, DRS generated a notice of the amount he would have to pay to reinstate his full benefits and the date such payment would be due. But Tassoni did not receive the notice and failed to meet the payment deadline. DRS then denied Tassoni's request to restore 99 months of service credit to his Public Employees' Retirement System account. Following a hearing, Presiding Officer Ceil Buddeke found that DRS properly mailed notice to Tassoni and his employer, that the time period to restore Tassoni's benefits was not tolled, and that Tassoni failed to establish the elements of equitable estoppel. The superior court affirmed DRS's final order. We hold that the evidence was insufficient to show that DRS mailed the notice to Tassoni's employer and that, as a result, the time period to reinstate his benefits was tolled. We reverse.

## FACTS

Peter Tassoni is a member of the Public Employees' Retirement System (PERS), Plan I. He wants to restore 99 months of service credit that he previously withdrew.

Tassoni has worked for a number of PERS employers since 1973. He worked for the Port of Seattle from April 1973 to September 1975. When he left the Port, he withdrew all his PERS contributions, which terminated his PERS membership. He then began work at the Department of Labor and Industries (L & I), where he worked until May 1976. While at L & I, Tassoni received a notice from the Department of Retirement Systems (DRS) that he could restore service credit from the Port employment by making the necessary payment by May 1, 1976. When he left employment at L & I, Tassoni again withdrew all his PERS contributions.

Tassoni again went to work for L & I in August 1976 and worked there for 99 months, until October 1984. When he left L & I the second time, he again withdrew all his PERS contributions. It is this 99-month period of service that Tassoni now seeks to restore.

From March 1985 to May 1989 (51 months), Tassoni worked for the Department of Social and Health Services (DSHS). In August 1985, DRS sent Tassoni a notice informing him that he could restore service credit for 97 months[1] of L & I employment by paying the withdrawn contributions "within 60 eligible months after being reemployed." Admin. R. (AR) at 113. Tassoni did not pay to restore his service credit. When he left DSHS in May 1989, he again withdrew all his PERS contributions.

Tassoni returned to DSHS employment in February 1991. On July 15, 1991, DRS generated two notices regarding Tassoni's previously withdrawn service credit. One notice stated that Tassoni could restore service credit for

---

[1] This letter incorrectly stated that the restorable service credit was 97 months; the correct amount was 99 months.

the 51-month DSHS employment by making the necessary payment by January 31, 1996. Tassoni received this notice and restored this credit on August 30, 1991. The other notice stated that he could restore service credit for the 99-month L & I employment by making payment by October 31, 1991. Tassoni did not receive this notice.

On January 12, 1993, Tassoni wrote a letter to DRS asking if he could restore any more service credit. DRS replied that the 60-month period to repay withdrawn contributions had expired, precluding Tassoni from restoring additional credit. His attorney then requested that DRS permit Tassoni to restore the 99-month L & I credit. DRS Membership Administrator Jack Bryant denied this request and Tassoni appealed to the Director of DRS on July 11, 1995. He argued that former RCW 41.40.150(2) and (4) (1989) required that he receive actual notice of his right to restore service credit, that DRS did not comply with these statutory requirements, and that DRS should be estopped to deny his request to restore service credit.

At a hearing in September 1997, a DRS employee described DRS's mail collection and distribution system. Another DRS employee, Lisa Phelps, described the agency's custom governing generation and mailing of service credit restoration notices. She testified that when the State rehired a PERS employee, DRS would print out a three-part restoration notice. DRS would mail one copy to the employee (either at the employee's home address or work address), mail one copy to the employer (here, DSHS), and place the third copy in the employee's DRS file. Phelps stated that Tassoni's DRS file contained a copy of both the 51-month notice and the 99-month notice. DRS would have mailed both restoration notices—the 99-month one and the 51-month one—in the same envelope. There was no address printed on either the 99-month notice or the 51-month notice from the DRS file. Phelps testified that DRS could have sent the notices to Tassoni at DSHS, or someone at DRS could have hand-addressed the notices.

Tassoni testified that he did not receive the 99-month

notice but that he did receive the 51-month notice. He could not remember whether the 51-month notice came to his house or to his employer. He admitted that it was "possible" that the 99-month notice was in the envelope with the 51-month notice and he simply did not see it. AR at 179. Tassoni stated that he would have restored the 99 months of credit had he known about it and that he had the funds to do so. He acknowledged that he knew there was a five-year window to restore service credit, but he "didn't know when that window started or when it ended." AR at 214.

Two of Tassoni's coworkers at DSHS testified that when Tassoni returned to DSHS, he said he intended to restore as much service credit as he could. Lila Hernandez, a DSHS personnel representative, testified that she receives DRS restoration notices and places them in the employees' files. She had searched Tassoni's DSHS file and found no copy of either the 51-month notice or the 99-month notice, nor did she recall getting the notices or discussing them with Tassoni.

Presiding Officer Buddeke found that Tassoni did not receive actual notice of the right to restore service credit. But she concluded that DRS had established proof of mailing the 99-month restoration notice, so that the notice was "presumed to have been mailed to both Mr. Tassoni and his employer." AR at 270. Buddeke also concluded that even if DRS had not established proof of mailing, former RCW 41.40.150(3) (1989) did not require it to notify Tassoni, and the 60-month restoration period runs even if the employee is not properly notified. Finally, DRS rejected Tassoni's argument that DRS should be equitably estopped from enforcing the 60-month restoration window.

Tassoni petitioned the superior court for review. The court found that substantial evidence supported the conclusion that DRS properly mailed the 99-month notice, which was "fatal" to Tassoni's equitable estoppel argument. Report of Proceedings (RP) at 52-53, 55.

Tassoni now appeals, contending that (1) former RCW

41.40.150(4) (1989) requires that he receive actual notice of the option to restore service credit, (2) substantial evidence does not support the finding that DRS properly mailed the 99-month notice, and (3) the 60-month repayment window should be tolled, or DRS should be estopped to deny his request to restore service credit.

## ANALYSIS

### I. Standard of Review

We review a final administrative order under the Administrative Procedure Act (APA), applying the APA standards directly to the agency record. RCW 34.05.570(3); *Tapper v. Employment Sec. Dep't*, 122 Wn.2d 397, 402-03, 858 P.2d 494 (1993). We reverse an administrative decision that is (1) based on an error of law; (2) not based on substantial evidence; or (3) is arbitrary or capricious. RCW 34.05.570(3); *Tapper*, 122 Wn.2d at 402. In reviewing an error-of-law claim, we are not bound by the agency's interpretation, but we give substantial weight to the agency's view of the law it administers. *William Dickson Co. v. Puget Sound Air Pollution Control Agency*, 81 Wn. App. 403, 407, 914 P.2d 750 (1996). Substantial evidence is "a sufficient quantity of evidence to persuade a fair-minded person of the truth or correctness of the order." *City of Redmond v. Cent. Puget Sound Growth Mgmt. Hearings Bd.*, 136 Wn.2d 38, 46, 959 P.2d 1091 (1998) (quoting *Callecod v. State Patrol*, 84 Wn. App. 663, 673, 929 P.2d 510 (1997)).

### II. Former RCW 41.40.150

In 1991, when Tassoni was eligible to restore the 99 months of service credit, RCW 41.40.150 stated in relevant part:

> (2) An employee not previously retired who reenters service shall upon completion of six months of continuous service and upon the restoration of all withdrawn contributions with interest as computed by the director, which restoration must be

completed within a total period of five years of membership service following the member's first resumption of employment, be returned to the status, either as an original member or new member which the member held at time of separation.

. . . .

(4) Within the ninety days following the employee's resumption of employment, the employer shall notify the department of the resumption and the department shall then return to the employer a statement of the potential service credit to be restored, the amount of funds required for restoration, and the date when the restoration must be accomplished. The employee shall be given a copy of the statement and shall sign a copy of the statement which signed copy shall be placed in the employee's personnel file.

Thus, the statute permitted employees to restore service credit by repaying previously withdrawn PERS contributions within 60 months of first resuming employment. The 60-month deadline ran only while the employee worked in a PERS-eligible position. If the employee terminated PERS-eligible employment, the 60 months stopped running; it resumed when the employee returned to PERS work. The 60-month period would not begin anew. Here, the 60-month window for Tassoni to restore his 99 months of L & I service credit began when he resumed State employment in March 1985. Had he worked continuously, the 60-month period would have expired in March 1990. But Tassoni worked only 51 months. Thus, when he *again* resumed employment in February 1991, he had 9 more months in which to restore the 99-month service credit.

In 1994, the legislature amended the statute's notification provisions. Now, DRS must give notice of the right to restore credit only when an employee terminates employment and withdraws PERS contributions. The legislature also added a provision allowing an employee to restore service credit after the 60-month period has elapsed, but the cost to restore is much higher than if the employee had restored credit during the 60-month period. *See* RCW 41.50.165(2).

### III. Proof of Mailing

Tassoni argues that former RCW 41.40.150(4) (1989) required that he be given actual notice of his right to restore service credit. In support of this argument, Tassoni points to the statutory language that requires his signature on a copy of the notice in his personnel file. DRS counters that the statute does not require actual notice and, in any event, its only obligation under the statute is to "return" the statement with reinstatement information to the employing agency. Thus, according to DRS, if actual notice is required, the statute does not require DRS to give the notice and it cannot, therefore, be estopped from denying Tassoni reinstatement benefits. But we need not resolve this issue because we hold that the evidence is insufficient to show that DRS mailed the notice to Tassoni's employer, and the presumption of mailing by showing a custom was rebutted.

Under Washington law, a party seeking to prove mailing must show (1) an office custom with respect to mailing *and* (2) compliance with the custom in the specific instance. *Kaiser Aluminum & Chem. Corp. v. Dep't of Labor & Indus.*, 57 Wn. App. 886, 890, 790 P.2d 1254 (1990). Here, one DRS employee described DRS's mail pickup and distribution system, including both U.S. mail and "campus mail" (mail between State agencies). Another DRS employee described how DRS generates restoration notices and prepares them for mailing. Neither employee testified that DRS complied with the mailing custom in this specific instance or even on the day Tassoni's restoration notice was printed. In fact, the employee who described the custom regarding preparation and mailing of restoration notices said she had "no idea" if she had personally mailed these notices. AR at 232.

The only evidence that suggests that DRS complied with the mailing custom in this case was the presence of a copy of the disputed notice in Tassoni's DRS file. Lisa Phelps testified that someone would have generated the file copy at the same time he or she generated Tassoni's and

DSHS's copy of the restoration notice. But this supports only an inference that DRS generated the notice, not that it mailed the notice.

In its final order, DRS acknowledged that there was no testimony regarding compliance with the mailing custom in this instance. But, it said, "[t]hat is . . . the point of the *Farrow* [*v. Dep't of Labor & Indus.*, 179 Wash. 453, 38 P.2d 240 (1934)] presumption: in an office handling a large amount of mail, no one can remember the fact of mailing any particular notice." AR at 270 n.8. This statement ignores or misunderstands *Farrow*'s requirement that there be evidence of compliance with the mailing custom in the specific instance at issue,[2] which is lacking here. Thus, substantial evidence does not support DRS's finding that it properly mailed the notice as required by statute.[3]

■ Moreover, Tassoni and his employer rebutted any presumption that the notice was mailed. Tassoni testified that he did not receive the notice and the hearing officer accepted this testimony. His DSHS personnel file did not contain a copy of the notice signed by Tassoni as the statute required. Finally, the DSHS employee who receives such notices and places them in employees' files testified that she did not remember getting the notice.

■ ■ DRS argues that, even if the 1991 notice was

---

[2] In *Kaiser*, one of the parties argued that ER 406 superseded the *Farrow* line of cases, citing 5 KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE § 129, at 465-66 (1989). Tegland states that ER 406, concerning admissibility of evidence of an organization's routine practice, "abandons the requirement, occasionally expressed in earlier opinions, that the evidence be corroborated by evidence that the routine practice was in fact followed on the occasion in question. Under Rule 406, lack of corroboration goes to the weight of the evidence, not its admissibility." Tegland also explains that ER 406 "makes obsolete" the *Farrow* line of cases requiring evidence of "both the company's mailing routine and the testimony of the persons involved in handling the particular piece of mail in question." *Kaiser*, 57 Wn. App. at 891.

The *Kaiser* court rejected the argument that ER 406 supersedes the *Farrow* line of cases. ER 406 governs *admissibility* of such evidence, but the question in *Kaiser* was the *sufficiency* of the evidence, and the appellant had not established "the complete mailing cycle." *Kaiser*, 57 Wn. App. at 891.

[3] Tassoni also argues that the presumption-of-mailing rule is inapplicable to campus mail. Because DRS did not establish that it complied with the mailing custom, we need not decide whether the presumption-of-mailing rule applies to campus mail.

insufficient, the statute required it to notify Tassoni only after his *first* resumption of employment following the 99-month period of employment. Former RCW 41.40.150(4) (1989) stated that the employer shall notify DRS of an employee's resumption of employment "[w]ithin ninety days following the employee's resumption of employment." DRS must then provide information regarding the employee's right to restore service credit. DRS contends that the statute does not require DRS to notify an employee after *every* resumption of PERS employment, only after the *first* resumption of employment. Because it complied with the statute when Tassoni first resumed employment in 1985, the statute, according to DRS, was satisfied. DRS bases this argument on its assumption that "resumption of employment" in subsection (4) of RCW 41.40.150 necessarily refers to the "first resumption of employment" in subsection (2) of the statute. Br. of Resp't at 26-27.

This argument is unpersuasive. Subsection (2) states that the 60-month window to restore withdrawn contributions shall run from the "first resumption of employment." Thus, even if an employee leaves PERS employment and returns *several times*, the 60-month window does not start over with each return to employment. Subsection (4) addresses the length of time DRS has to notify the returning employee of the option to restore service credit. Thus, the two subsections address different procedural concerns, and DRS's assertion that "resumption of employment" in subsection (4) necessarily means "*first* resumption of employment" is unfounded. "It is well settled that where the Legislature uses certain language in one instance but different, dissimilar language in another, a difference in legislative intent is presumed." *Millay v. Cam*, 135 Wn.2d 193, 202, 955 P.2d 791 (1998). Subsection (4)'s requirement that DRS notify the PERS employee 90 days after resumption of employment required that DRS notify the employee after *every* resumption of employment.

In sum, former RCW 41.40.150(4) (1989) required that DRS notify Tassoni's employer of his right to restore service

credit when he resumed employment in 1991. DRS failed to prove that it mailed the notice. And the presiding officer at the administrative hearing concluded that Tassoni did not receive actual notice.

## IV. Tolling of the 60-Month Period

Tassoni argues that the 60-month period should be tolled because DRS failed to prove it mailed the 99-month notice.[4] DRS concluded that tolling was an inappropriate remedy:

> [E]nforcement of the five-year restoration window does **not** depend on Mr. Tassoni having received notice of his deadline. The applicable law clearly contemplated that employees receive notice of their various service credit restoration deadlines. The legislature, however, stopped short of tolling the five-year deadline in cases where notice was for some reason not received.

AR at 271-72. According to DRS, the 60-month restoration window and the notice requirement of RCW 41.40.150(4) operate independently of each other, and the absence of a statutory remedy indicates that the legislature intended PERS employees to have no recourse even if DRS failed to follow statutory procedures.

When a statute grants a right but is silent regarding remedies, the court may provide a remedy. *Bennett v. Hardy*, 113 Wn.2d 912, 920, 784 P.2d 1258 (1990). We will do so if the plaintiff is within the class for whose "especial" benefit the statute was enacted, the legislative intent explicitly or implicitly supports creating or denying a remedy, and implying a remedy is consistent with the underlying purpose of the legislation. *Bennett*, 113 Wn.2d at 920-21.

---

[4] Although the cases he cites in support of his tolling argument are not exactly on point, the crux of his argument is that the proper remedy for DRS's failure to notify him is tolling of the 60-month period. Tassoni analogizes to cases applying the discovery rule, which provides that a cause of action does not accrue until the injured party knows or should have known the factual basis of the cause of action. *See Doe v. Finch*, 133 Wn.2d 96, 101, 942 P.2d 359 (1997); *Allyn v. Boe*, 87 Wn. App. 722, 736, 943 P.2d 364 (1997). Here, Tassoni does not seek to extend the period during which he may bring a cause of action; rather, he seeks only to suspend the running of the 60-month restoration window.

 Here, Tassoni is undoubtedly within the class for whose benefit this statute was enacted. And the legislative intent and underlying policy of the statute support allowing him a remedy. In a 1986 amendment to chapter 41.40 RCW, the legislature stated:

> The legislature finds that in the past public employees and teachers who had terminated employment, withdrawn their retirement contributions, and subsequently returned to public employment or teaching either did not receive proper notification of the procedure to reinstate their withdrawn contributions or they did not fully understand the limitation on such reinstatement. In 1973, the legislature recognized this fact and provided an extraordinary reinstatement period for such employees. Further in 1983, the legislature established clear notification procedures for the proper notification of the reinstatement policy for all such returning employees. Therefore, it is the intent of the 1986 act to provide one last opportunity for reinstatement of withdrawn contributions to those who may have not been properly informed or misunderstood the reinstatement procedure.

LAWS OF 1986, ch. 317, § 1. The legislature was clearly aware that DRS was not properly notifying PERS employees that they could restore service credit; accordingly, the legislature set forth clear procedures to fix the problem and allowed PERS employees several "extraordinary reinstatement period[s]."

But DRS argues that other legislative history shows that the legislature did not intend to toll the 60-month period, even if it does not properly notify employees of their restoration rights. DRS reasons that when it enacted an "extraordinary reinstatement period" in 1986, the legislature intended that to be the *exclusive* remedy for employees who had not been properly notified of the option of restoring service credit. In addition, the governor twice vetoed legislation that would have allowed two other extraordinary reinstatement periods. LAWS OF 1983, ch. 233, §§ 1(2), 2(3); LAWS OF 1981, ch. 294, §§ 10-11. And in 1994, the legislature

amended the statutory notice provisions to simply require DRS to inform the employee of the right to restore when the employee terminates employment and withdraws PERS contributions. RCW 41.50.170. This legislative history, argues DRS, suggests that tolling the 60-month restoration window is an inappropriate remedy. We disagree.

The legislature's intent in enacting notification requirements was to ensure that employees were made aware of the option to restore service credit. Allowing employees a remedy when DRS failed to comply with the statutory requirements is consistent with the legislative intent and the statute's underlying policy. Thus, DRS's decision denying Tassoni's request to toll the 60-month restoration period was improper.

Reversed.

HOUGHTON and HUNT, JJ., concur.

Review denied at 145 Wn.2d 1030 (2002).